NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 27 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| LUIS F. RODRIGUEZ,<br><br>            Plaintiff-Appellee,<br><br>  v.<br><br>ACCC INSURANCE COMPANY, a Texas corporation,<br><br>            Defendant-Appellant,<br><br> and<br><br>FREEDOM NATIONAL INSURANCE SERVICES, INC.; UNKNOWN PARTIES, Named as: John and Jane Does I-X, ABC Partnerships I-X, Black Corporations I-X,<br><br>            Defendants. | No.   18-16438<br>        19-16027<br><br>D.C. No. 2:16-cv-00998-ROS<br><br>MEMORANDUM* |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Submitted June 2, 2020**
Portland, Oregon

---

    \*      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

    \*\*     The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Before: BERZON, COLLINS, and VANDYKE, Circuit Judges.

Memorandum joined by Judge BERZON and Judge VANDYKE;
Dissent by Judge COLLINS

We have jurisdiction to review this appeal under 28 U.S.C. § 1291. We reverse the district court's grant of summary judgment to Luis Rodriguez. The district court incorrectly interpreted *Transportation Insurance Co. v. Bruining*, 921 P.2d 24 (Ariz. 1996) to require a signature on the specific Driver Exclusion Endorsement provision, and material facts remain in dispute regarding the import of the signatures on Vincente Pita's car insurance application.

We review orders granting summary judgment de novo and "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Baker v. Liberty Mut. Ins. Co.*, 143 F.3d 1260, 1263 (9th Cir. 1998). We also review the district court's interpretation of state laws de novo. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc).

Arizona statute section 28-4009(A)(3) requires an "agreement in writing between a named insured and the insurer" for "the policy [to] exclude as insured a person or persons designated by name when operating a motor vehicle." When evaluating Arizona insurance contracts, under statute section 20-1119(A) "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any

2

rider, endorsement or application attached to and made a part of the policy."

The district court misinterpreted *Bruining*, the Arizona Supreme Court's authoritative interpretation of Arizona statute section 28-4009(A)(3). *Bruining* does *not* require a separately signed exclusion provision. Rather, it held that an "agreement in writing" to exclude someone from coverage requires "something more than … ex parte utterance[s]" not clearly conveyed to the insured or a "writing by the insurer which is unacknowledged by the insured." *Bruining*, 921 P.2d at 27. *Bruining*'s "agreement in writing" requirement to exclude individuals from coverage does not mandate specific signatures on particular provisions. *Id.*

Pita's signed agreement with ACCC presents quite different facts from those in *Bruining* that, if resolved in ACCC's favor, could result in Wendy's valid exclusion under Arizona law. Unlike in *Bruining*, where the record did not disclose whether the insured had been advised of the "per policy expiring" language, here Pita must have affirmatively given Mirage's broker information about his wife and daughter because he was opening a new policy. According to Mirage, unlike the broker-to-insurer conversation in *Bruining* Mirage's broker explained the entire agreement directly to Pita, including that his wife and daughter were excluded.[1] It is uncontested that Pita signed the application multiple times on multiple pages,

---

[1] Soon after Wendy's accident with Rodriguez, Pita requested that Wendy be added to his policy. This request would make no sense if Pita already considered Wendy to be a covered driver.

including a signature block on the same page as the exclusion, and signed the policy jacket stating that he agreed to "the entire application." The various signatures on the agreement show the policy terms cannot be deemed "unacknowledged" because they were avowedly reviewed by Pita. *See id.* at 26.

The dispositive factual issue in this case—whether Pita's signature on the policy jacket constituted his agreement with the exclusion provision—cannot be decided on this summary judgment record. To settle that question, a factfinder will need to determine disputed material facts about the meeting between Pita and Mirage Insurance's broker and whether Pita's signing of the agreement (including the policy jacket language) represented agreement with the entire application. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] It is not clear in the summary judgment record whether the entire policy, including the policy jacket, was presented to Pita as one integrated document. Depending on the facts found after a trial, the lack of a signature on the exclusion provision could be immaterial given Pita's signature on the policy jacket agreeing to the "entire application."[3]

---

[2] ACCC argued that it could establish some of these facts for purposes of summary judgment with its proffered Rule 59(e) evidence. But ACCC cannot meet its high burden under Rule 59(e) because it was not "excusably ignorant" of any of these pieces of information; the relevant information was in the possession of its co-defendants and subsidiaries. *United States v. Bransen*, 142 F.2d 232, 235 (9th Cir. 1944). We therefore affirm the district court's denial of ACCC's Rule 59(e) motion. But given the summary judgment posture of this case, the court should have assumed the disputed facts concerning the meeting at which the agreement was signed in ACCC's favor in any event.

[3] The dissent argues Pita could not have evinced agreement with the Exclusion unless he signed directly under it, pointing to language in the Exclusion section stating that the applicant

4

The district court alternatively reasoned that because ACCC-affiliated employees indicated that an unsigned exclusion provision made it inoperative, the employees' understanding superseded the final signature indicating Pita's agreement with all terms. Given the conflicting testimony as to the significance of the unsigned provision, this determination improperly decided disputed facts against ACCC, the nonmoving party. It was also contrary to the employee testimony provided and the plain language of the signed provision. Mirage's broker Magali Islas disclaimed knowledge of the legal significance of the provision, ACCC's Freedom National's Sandra Martinez discussed the impact of *other* companies' exclusion provisions, and Freedom National (30)(b)(6) witness Ashley Rodriguez described the exclusion provision only as "acknowledging [insureds have] *read* through the statements

_____

"understand[s] and agree[s]" that the people listed therein are excluded, and that the endorsement was "executed." But that merely begs the question whether the applicant's signature *in that section*—versus at the end of the document—is tied to such agreement. The actual text of the Exclusion section itself says nothing about a signature *there* demonstrating agreement or executing the endorsement. Rather, the language above the signature line in the Exclusion section simply says: "My signature below acknowledges receipt from my agent of a copy of this executed endorsement." In contrast, as noted, on the last page of the agreement (where Pita did sign) the contract specifically ties that signature to an "agree[ment] to the statements made" in "the entire application"—including the statements in the Exclusion. The dissent's insistence that a signature in the Exclusion section is somehow evidence of "agreement" with that section, while the signature at the end of the contract is not, is exactly backwards from what the contract's actual language says.

The dissent incorrectly portrays the application form as providing a menu of different options, which Pita picked (or rejected) by signing or initialing each section (or not). Rather than a menu, the text and structure of the document is more like a diner's post-dinner bill, itemizing and disclosing the *prior* choices Pita made during his discussion with Mirage's broker. The function of the signature under the Exclusion section was not to make a choice among options, but just to record that the applicant had read the choice he made.

5

we've provided." (emphasis added). Contrary to the district court's assumption that the "natural corollary" to an unsigned exclusion provision means no excluded parties, under Arizona law the signatures on other portions of the agreement mean all provisions must be "construed according to the entirety of its terms." Ariz. Rev. Stat. Ann. § 20-1119(A). In ruling otherwise, the district court misapplied the "relevant substantive law." *Baker*, 143 F.3d at 1263.

Given that the district court misconstrued Arizona law as interpreted in *Bruining* and that material facts remain in dispute, we reverse and remand to the district court for further proceedings.[4]

**REVERSED** and **REMANDED**.

---

[4] Because we reverse the district court's grant of summary judgment to Rodriguez, we reverse the award of attorneys' fees and deny Rodriguez's Rule 54(b) motion. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

FILED

OCT 27 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

COLLINS, Circuit Judge, dissenting:

As applicable here, Arizona law provides that, absent an "agreement in writing" between named insured Vicente Pita ("Pita") and Defendant-Appellant ACCC Insurance Company ("ACCC"), Pita's daughter is a covered driver under Pita's insurance policy with ACCC. *See* ARIZ. REV. STAT. § 28-4009(A)(3). The majority concludes that there is a triable issue of material fact as to whether Pita and ACCC had such a written agreement and that the district court therefore erred in granting summary judgment to Pita's assignee, Plaintiff-Appellee Luis Rodriguez ("Rodriguez"). I disagree, and I therefore respectfully dissent on that point. I would instead affirm the district court's judgment, except that I would remand the case for the limited purpose of requiring the district court to reduce its award of attorney's fees to Rodriguez.

1. The relevant insurance agreement in this case includes a page showing two separate exclusions that are set forth in separate boxes of text, each with a space for the insured to sign. The first box contains a "Commercial, Business, and Professional Use Exclusion" that would exclude coverage for commercial use of the covered vehicle. The second box sets forth a "Driver Exclusion Endorsement" that would exclude Pita's wife and daughter from the policy. It is undisputed for purposes of summary judgment that Pita signed the first box but that he did *not*

affix the signature that appears in the second box. The question presented in this appeal is whether this insurance contract includes the necessary written agreement excluding Pita's daughter, and I agree with the district court that, as a matter of law, it does not.

a. ACCC's primary contention on appeal is that, in opposing summary judgment, it presented sufficient evidence to allow a reasonable inference that Pita authorized someone else to sign for him on that line. But as the district court correctly noted, ACCC presented no evidence, either from Pita or from the insurance agency that arranged the policy, indicating that Pita had ever authorized someone else to sign for him.[1] ACCC's proffered inference thus impermissibly rests on nothing more than unsupported speculation that Pita might have done so. *See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1542 (9th Cir. 1988) ("speculative inferences" are insufficient to defeat summary judgment). The majority properly does not rely on this theory.

b. As the majority recognizes, the relevant issue thus becomes how the written agreement should be interpreted when the signature space in the Driver

---

[1] I agree with the majority that the district court did not abuse its discretion in denying ACCC's motion under Federal Rule of Civil Procedure 59(e), which belatedly sought to supplement the summary-judgment record with evidence previously available to ACCC. *See* Mem. Dispo. at 4 n.2. I therefore do not consider any of the additional evidence that ACCC submitted with that motion, but in any event, nothing in that evidence would warrant a different conclusion here.

Exclusion Endorsement is left blank. *See* Mem. Dispo. at 3–5. In finding an ambiguity that requires a consideration of extrinsic evidence at a trial, the majority relies on "Pita's signature on the policy jacket agreeing to the 'entire application.'" *See id*. at 4. The majority is referring to the "Receipt for Policy Jacket" that appears as the sixth page in the agreement, and which contains Pita's signature below more than a half-page of text that includes the following sentence: "I HAVE READ THE ENTIRE APPLICATION and fully understand and agree to the statements made." According to the majority, whether Pita's signature on the policy jacket is *itself* sufficient to create the requisite written agreement excluding his daughter from coverage cannot be determined without resolving disputes about extrinsic facts at a trial. *Id*. at 4–5. I disagree.

Under Arizona law, consideration of extrinsic evidence in construing an insurance agreement is permissible only if the party relying upon such evidence first shows "that the language of the contract is 'reasonably susceptible' to [its] proposed interpretation." *Doneson v. Farmers Ins. Exch.*, 431 P.3d 198, 201 (Ariz. Ct. App. 2018) (citation omitted). The majority's theory is that Pita's statement that he "fully understand[s] and agree[s] to the statements made" can reasonably be construed as accepting the Driver Exclusion Endorsement even though he did not sign the special signature line in the box containing that endorsement. For two reasons, I do not think that the quoted language can reasonably bear this reading.

3

First, as the district court noted in rejecting ACCC's comparable theory below, this reading of the policy-jacket receipt ignores the "structure" of the Driver Exclusion Endorsement and of the agreement as a whole. The various elements of the agreement set forth a number of different options and contain nine additional places for Pita to either initial or sign. It is simply not a reasonable reading of this document to conclude that whether Pita did or did not sign or initial in those various additional places is "immaterial" to its interpretation. *See* Mem. Dispo. at 4. Everyone agrees that if Pita *had* signed the Driver Exclusion Endorsement, then it would be part of the agreement and his daughter would be excluded. To say that the same could be true if he did *not* sign that box, merely because he agreed to the overall contract, is question-begging and effectively reads that box's signature block out of the document.

In reaching a contrary conclusion, the majority points to language in the Driver Exclusion Endorsement stating that the applicant's signature in that box "acknowledges receipt from my agent of a copy of this executed endorsement," and the majority claims that this language shows that "[t]he function of the signature under the Exclusion section was not to make a choice among options, but just to record that the applicant had read the choice he made." Mem. Dispo. at 5 n.3. In addition, the majority contends that "[t]he actual text of the Exclusion section itself says nothing about a signature *there* demonstrating agreement or

4

executing the endorsement." *Id.* These contentions fail, because the majority overlooks the fact that immediately before the cited receipt-acknowledging sentence, in the very same paragraph, the Driver Exclusion Endorsement explicitly states that "I understand *and agree* that there will be no coverage afforded on this policy . . . to the person(s) listed below" (emphasis added). Moreover, the receipt-acknowledging sentence itself refers to the receipt of an "*executed* endorsement" (emphasis added), thereby further confirming that this "endorsement" needed to be executed to be effective. The majority's notion that the "endorsement" could be "executed" by signing the policy-jacket receipt, *see id.*, is not a reasonable reading of the text of the Driver Exclusion Endorsement.

Second, any doubt on this score is eliminated by the other language contained in the "Receipt for Policy Jacket," which the majority ignores. The opening language of that receipt states as follows (emphasis added):

> You have *selected* your auto insurance from coverages contained in this policy contract (jacket). It describes *the various coverages and exclusions that are available* through this auto insurance program. READ THIS DOCUMENT CAREFULLY. It will help you understand the coverages that you have *selected*.

This language confirms what the structure of the document already makes clear, which is that its various elements provide available *options* from which the insured must make *selections*. This confirms that the various boxes to check or initial, and the specific places to sign or not to sign, are how the insured makes those

5

selections.  Viewed against this backdrop, the statement in the policy-jacket receipt that the insured "agree[s] to the statements made" merely ratifies whatever choices are shown elsewhere in the document.  It cannot reasonably be read as *making* those choices.

Because the relied-upon language from the policy-jacket receipt is not reasonably susceptible to the majority's reading, no consideration of extrinsic evidence is necessary or permitted and no trial is necessary to resolve asserted conflicts over such evidence.

c.  There is no other language in this insurance agreement that, in the absence of a signature in the Driver Exclusion Endorsement, provides the necessary written consent of Pita to the exclusion of his daughter from coverage. Accordingly, under § 28-4009(A)(3), she was not excluded from coverage.  *See Transp. Ins. Co. v. Bruining*, 921 P.2d 24, 26–27 (Ariz. 1996).  The district court therefore properly granted summary judgment to Rodriguez.

2.  In my view, however, the district court abused its discretion by increasing the attorney's fee award above the lodestar amount, which was $244,791.50. "'[T]he lodestar figure should be adjusted upward or enhanced only in rare and exceptional circumstances.'"  *Kadish v. Arizona State Land Dep't*, 868 P.2d 335, 346 (Ariz. Ct. App. 1993) (citations omitted).  The district court concluded that this was such an exceptional case because (1) ACCC's actions dragged out the

6

litigation and thereby increased the attorney work and expense incurred; and (2) "because counsel accepted the case with 'no guarantee of payment.'" The first factor is already taken into account in determining the lodestar amount and does not provide the sort of exceptional circumstance that would warrant an enhancement. *Kadish*, 868 P.2d at 346. The second factor is true in every contingency case and is therefore not an exceptional case-specific factor. Accordingly, I would reverse the fee award and remand for entry of an award, with respect to the phase of the case at issue, equal to the lodestar amount of $244,791.50.

3. By contrast, I do not believe that the district court abused its discretion in awarding certain costs under Federal Rule of Civil Procedure 37 in light of ACCC's failure to admit earlier in the litigation that Pita's signature was not genuine. *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994). While I might have reached a different conclusion under de novo review, the district court's award was based on an evaluation of the proper factors under a permissible view of the record. There was no abuse of discretion.